Filed 10/14/15  McAdams v. Monier, Inc. CA3

# NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### THIRD APPELLATE DISTRICT

**(Placer)**

----

| | |
|---|---|
| TIM McADAMS, | C073435 |
| Plaintiff and Appellant, | (Super. Ct. No. S-CV-0016410) |
| v. | |
| MONIER, INC., | |
| Defendant and Respondent. | |

This case is before us for the third time.  The third time's not always the charm.  Once again, this matter is going back.

This case is a misrepresentation-based class action under the Consumers Legal Remedies Act (CLRA) (Civ. Code, §§ 1750 et seq., 1770, subds. (a)(5) & (7)) and the unfair competition law (UCL) (Bus. & Prof. Code, §§ 17200 et seq., 17500).  Plaintiff Tim McAdams, on behalf of himself and all others similarly situated (plaintiff), alleges that defendant Monier, Inc. (Monier), on its own and through unwitting intermediaries in

1

the housing sale and construction industries (parroting Monier statements or information), represented that Monier's slurry-coated concrete roof tiles would last 50 years, would have a permanent color, and would be maintenance-free, when, in fact, Monier knew, but failed to disclose, that the color composition of its roof tiles would erode away well before the end of the represented 50-year lifespan. In short, as we said on remand in *McAdams v. Monier, Inc.* (2010) 182 Cal.App.4th 174 (*McAdams II*),[1] "[t]he focus of the CLRA and the UCL class actions is on an alleged single, specific material misrepresentation involving a failure to disclose the particular fact of premature color erosion to bare concrete . . . " (*id.* at p. 192).

Here, we conclude the trial court properly excluded a plaintiff expert's statistical sampling testimony concerning class size, but improperly determined that this testimony also constituted the evidence of class liability and class damages. Accordingly, we shall reverse the judgment and the award of costs to Monier, and remand the matter for the class size to be determined and for further proceedings based on that figure.

### FACTUAL AND PROCEDURAL BACKGROUND

Our first two encounters with this case concerned class certification and bookended an intervening California Supreme Court case—*In re Tobacco II Cases* (2009) 46 Cal.4th 298 (which concerned issues of standing under the UCL in light of a 2004 initiative measure, Prop. 64). From these encounters, we ultimately concluded that the trial court erred in denying class certification to the CLRA and the UCL classes; and we agreed with *Massachusetts Mutual Life Ins. Co. v. Superior Court* (2002) 97 Cal.App.4th 1282, 1293, that an " 'inference of common reliance' " may be applied to

---

[1] In light of the substantial prior history of this case, and for the sake of clarity, we shall refer to our February 24, 2010 opinion on remand as *McAdams II*. (*McAdams II*, *supra*, 182 Cal.App.4th 174.) An unpublished opinion filed on May 30, 2007 (case No. C051841) constitutes *McAdams I*; today's opinion represents *McAdams III*.

a CLRA class that alleges a material misrepresentation consisting of a failure to disclose a particular fact in light of other information that is disclosed. (*McAdams II*, *supra*, 182 Cal.App.4th at pp. 178-179.)

In *McAdams II,* in light of this " 'inference of common reliance,' " we also added the following "proviso" to the definition of the CLRA and UCL classes: "[T]he members of these classes, prior to purchasing or obtaining their Monier roof tile product, had to have been exposed to a statement along the lines that the roof tile would last 50 years, or would have a permanent color, or would be maintenance-free." (*Id.* at pp. 178-179; see *id*. at p. 184; see also *In re Tobacco II Cases*, *supra*, 46 Cal.4th at p. 324.) This "proviso" was based on the principle of law that fraud or deceit, in the CLRA (and the UCL) context, may consist of the suppression of a known fact (i.e., premature color erosion) by one who gives information of other facts (i.e., 50-year life, permanent color, or maintenance-free), which are likely to mislead given the suppression of that known fact. (*McAdams II*, *supra*, 182 Cal.App.4th at p. 185.)

The CLRA and UCL classes essentially comprised Californians who owned homes for personal use with slurry-coated roof tiles sold by Monier between January 1978 and August 14, 1997 (or who previously owned such a home and paid to replace or repair such tiles), and who satisfied the *McAdams II* proviso. (See *McAdams II*, *supra*, 182 Cal.App.4th at pp. 179-180.)

To determine whether someone satisfied the *McAdams II* proviso, plaintiff employed a statistical expert, Gary Lorden, Ph.D. Dr. Lorden's statistical sampling method used a sample of 22 individuals who owned homes with the roof tiles at issue, and attempted to extrapolate from this sample the number of individuals who had been exposed (out of 127,746, the estimated number of California homes with the roof tiles at issue, a number determined by a different expert) to at least one of the three Monier statements in "the proviso," prior to purchasing or obtaining their Monier roof tiles. We

will discuss Dr. Lorden's statistical sampling method in greater detail when we discuss the trial court's exclusion of his testimony, but this is as far as we need to go now.

Trial began in October 2012 and lasted 31 days.

To prove Monier's liability, plaintiff deposed the 22 homeowners in the sample Dr. Lorden used and had 16 of them, along with class representative Tim McAdams and three other homeowners, testify at trial. These witnesses testified essentially (1) they were told, most commonly from intermediaries in the housing industry but occasionally from Monier literature, that their slurry-coated Monier roof tiles would last 50 years, or would retain permanent color, or would be maintenance-free; and (2) they relied on these representation(s) to their detriment, as the color of their roofs eroded prematurely, usually to bare, gray concrete. Plaintiff also (1) had nine former Monier employees testify, especially regarding Monier's relevant marketing practices; (2) presented Monier marketing literature on the slurry-coated roof tiles; (3) presented a damages expert, Phillip Waier, who opined that the average cost to recoat a Monier tile roof is $3,705; and (4) presented an accounting expert, Clifford Kupperberg, who estimated the total number of home roofs in California with the Monier slurry-coated tiles at issue at 127,746.

Monier countered at trial with testimony from (1) six (of the 22) sampled homeowners not called by plaintiff as well as 31 additional homeowners (via deposition testimony), (2) several former Monier employees, and (3) two experts of its own (who criticized plaintiff's "proviso" sampling method).

The jury, in a verdict form with special interrogatories, found that Monier made a material misrepresentation to plaintiff—i.e., the Monier slurry-coated roof tiles would last 50 years, or would have permanent color, or would be maintenance-free, while failing to disclose that the color coat would deteriorate in less than 50 years—and that plaintiff relied upon this misrepresentation to its detriment (damage). Using Dr. Lorden's statistical sampling method, the jury found there were 2,000 class members. The jury

4

awarded plaintiff $7.41 million in damages (the class size of 2,000 multiplied by $3,705—the average cost to recoat a Monier slurry-coated tile roof). This amount of damages constituted a small portion of the class size and the damages that plaintiff had sought.

Pursuant to evidentiary and other rulings deferred until after the jury rendered its verdict, the trial court excluded Dr. Lorden's statistical sampling method and accompanying expert opinion, finding that it lacked a reasonable basis for accuracy. The trial court also concluded that since plaintiff's case rested upon Dr. Lorden's method and opinion not only as to class size but also as to class liability and damages, there was no longer any relevant evidence before the fact finder as to class size, liability, or damages.

Consequently, the trial court (1) granted Monier's motion for nonsuit as to the jury-tried CLRA action and Monier's motion for judgment on the court-tried UCL action (the UCL action was based on the same material misrepresentation as the CLRA action (*McAdams II*, *supra*, 182 Cal.App.4th at p. 188));[2] (2) entered judgment for Monier; and (3) ordered plaintiff to pay Monier's litigation costs of $117,580.05.

Plaintiff appeals the judgment and the award of costs to Monier.[3] We conclude the trial court did not abuse its discretion in excluding Dr. Lorden's expert testimony concerning *class size*. But we also conclude the trial court erroneously found that Dr. Lorden provided plaintiff's only evidence on *class liability* and *damages* as well; and therefore the trial court erroneously granted nonsuit to Monier on the CLRA action, judgment to Monier on the UCL action, and costs to Monier. In short, the trial court erroneously conflated plaintiff's evidence on the *extent* of class liability (i.e., class size)

_____

[2] An action under the UCL, which is limited to injunctive, restitutionary and related relief, is tried to the court. (See *McAdams II*, *supra*, 182 Cal.App.4th at p. 188.)

[3] Monier filed a notice of cross-appeal, but has abandoned it.

with the *fact* of class liability.  The jury, as the fact finder here on the CLRA action and pursuant to special interrogatories in its verdict form, found that plaintiff had established the fact of class liability and the fact of class damages; and this was done through other evidence that is unchallenged here, and which the trial court effectively accepted as the fact finder in the court-tried UCL action.

## DISCUSSION

### I.  The Trial Court Did Not Abuse Its Discretion in Excluding Dr. Lorden's Statistical Sampling Method and Accompanying Expert Opinion

Dr. Lorden testified as to the size of the class using the statistical method of random sampling and extrapolation.  (See *Bell v. Farmers Ins. Exchange* (2004) 115 Cal.App.4th 715, 746 (*Bell*).)  The goal of Dr. Lorden's method, in line with the goal of statistical sampling generally, was to use a representative sample of the 127,746 subject homeowners to extrapolate to the whole.  (See *Duran v. U.S. Bank National Assn.* (2014) 59 Cal.4th 1, 38 (*Duran*).)[4]

Plaintiff's CLRA and UCL class actions were both based on the same material misrepresentation—i.e.,  against the backdrop of one of the three statements that Monier, or an intermediary parroting Monier, made (i.e., 50-year life, permanent color, or maintenance-free), Monier failed to disclose that it knew that the color on its slurry-coated roof tiles eroded prematurely.  (*McAdams II*, *supra*, 182 Cal.App.4th at pp. 186, 188.)  As we stated in *McAdams II*, "an 'inference of common reliance' may be applied to a CLRA class [and a UCL class] that alleges a material misrepresentation consisting of a failure to disclose a particular fact."  (*Id.* at p. 178; see *id*. at p. 184.)

---

[4]  The 127,746 figure—which the trial court found was sufficiently supported and acceptable and which the jury used, and which is not challenged in a cross-appeal—was provided by plaintiff's accounting expert, Clifford Kupperberg.  Kupperberg based this figure on census data of housing starts, invoice and production numbers from Monier's files, and testimony of Monier's employees regarding sales figures and market shares.

The trial court found Dr. Lorden's statistical sampling method lacked a reasonable basis for accuracy.

As described by plaintiff, Dr. Lorden's method comprised three steps: (1) a random (i.e., representative) sample of the population of the 127,746 California homeowners who had purchased or acquired Monier slurry-coated tile roofs (the sample here comprised 22 homeowners); (2) based on whatever percentage of this sample the jury believed had been exposed to a Monier misrepresentation prior to that purchase or acquisition (statement of 50-year life, permanent color, or maintenance-free, against a failure to disclose premature color erosion), Dr. Lorden extrapolated that percentage to the overall population of the 127,746 homeowners (an essential element of Dr. Lorden's method, then, was to have the representative homeowners testify at trial, and have *the jury* decide how many of those homeowners met "the proviso" of *McAdams II*); and (3) Dr. Lorden provided the jury with a chart, listing those numbers, corresponding to each percentage the jury could possibly assign. In this way, Dr. Lorden's results would yield the total number of California homeowners with Monier slurry-coated tile roofs who satisfied "the proviso," and thus were members of the class. Using Dr. Lorden's method, the jury found there were 2,000 class members.

In reviewing a trial court's exclusion of an expert witness's opinion testimony as lacking a reasonable basis, we ask whether the trial court abused its discretion. (*Lockheed Litigation Cases* (2004) 115 Cal.App.4th 558, 564.) We find no abuse here.

The critical step in Dr. Lorden's statistical sampling method was to obtain a *representative* sample of the 127,746 population. To do this, 29 clusters of residential development, comprising just over 4,700 homes, were identified statewide that had Monier slurry-coated tile roof homes. Sixteen of these clusters were drawn from a survey that Monier had done in 2005; the remaining 13 were identified by plaintiff. The goal was to depose a representative homeowner from each of the 29 clusters. Plaintiff's

7

counsel sent a letter and attached questionnaire randomly to 444 homeowners across the 29 clusters. Plaintiff deposed 22 of the homeowners; 16 of whom testified for plaintiff at trial.[5]

In the recent decision of *Duran*, *supra*, 59 Cal.4th 1, issued after the trial here, our state Supreme Court critiqued a statistical sampling method, in the process providing a primer on statistical sampling. As *Duran* emphasized, the essence of such a method, which is based on inferential statistics and probability theory, is to obtain a sample that is sufficiently representative of a whole population so as to fairly support inferences about the whole. (*Duran*, *supra*, 59 Cal.4th at p. 38.)

As we shall explain, the trial court, for several reasons taken together, did not abuse its discretion in essentially finding that the method Dr. Lorden used was not based on a representative sample. Indeed, the trial court's ruling excluding Dr. Lorden's statistical sampling testimony was prescient in many respects, in light of the criticisms *Duran* leveled at the statistical sampling method at issue there.

First, the sample size here was small. "A sample must be sufficiently large to provide reliable information about the larger group. 'How many cases need to be sampled? This depends in large part on the variability of the population. The more diverse the population, the larger the sample must be in order to reflect the population accurately. . . .' [Citation.] . . . [¶] . . . [¶] . . . With input from the parties' experts, the [trial] court must determine that a chosen sample size is statistically appropriate and capable of producing valid results within a reasonable margin of error." (*Duran*, *supra*, 59 Cal.4th at p. 42.)

In *Duran*, the class consisted of 260 employees who sued for unpaid overtime, claiming they had been misclassified as exempt from overtime compensation under the

---

[5] Monier presented at trial the deposition testimony of the remaining six homeowners.

outside salesperson exemption law.  (*Duran*, *supra*, 59 Cal.4th at p. 12.)  The *Duran* court found the sample size there of 20 (plus the two named plaintiffs) "[w]as [t]oo [s]mall" for determining the fact of class liability and damages.  (*Id.* at p. 42; see *id*. at pp. 33, 35, 37, 39-40.)  Admittedly, the class in *Duran* may have been more variable than the class here (given the *Duran* employees' various work schedules), and Dr. Lorden's expert testimony was designed to determine class size rather than to determine the fact of class liability or damages (i.e., Dr. Lorden provided an extrapolation method for the jury to use in determining the number of homeowners, out of the 127,746, who met the "proviso" we set forth in *McAdams II*).  But here, we have a sample of only 22 out of a (potential) class of 127,746.  As the trial court noted, Dr. Lorden testified that taking 88 depositions (rather than the 22) would have reduced the margin of error by 50 percent (this fact also demonstrates that the sample of 22 may have an intolerably large margin of error).  (*Duran*, *supra*, at p. 46.)  In contrast, in *Bell*, *supra*, 115 Cal.App.4th 715, which upheld a statistical method of random sampling and extrapolation for the determination of aggregate classwide damages in a class action for unpaid overtime, the parties deposed a sample of 295 employees out of a class of 2,402, which yielded a small margin of error.  (*Bell*, *supra*, at p. 724; see *id*. at pp. 746-756; see also *Duran*, *supra*, 59 Cal.4th at p. 42.)

Second, the random nature of the sample of 22 is questionable.  "A sample must be randomly selected for its results to be fairly extrapolated to the entire class. . . . 'A "random sample" is one in which each member of the population has an equal probability of being selected for inclusion in the sample.' "  (*Duran*, *supra*, 59 Cal.4th at p. 43.)

The low response rate to plaintiff counsel's 444 letters (with attached questionnaire) may have resulted in "nonresponse bias" in the sample of 22 (i.e., those who do not respond have no probability of inclusion in the sample).  (*Duran*, *supra*, 59 Cal.4th at p. 43.)  Also, the letter and questionnaire from plaintiff's counsel—while it did not mention "the proviso"—sought, as the trial court noted, the homeowners'

9

"assistance" in making plaintiff's case at trial. As the trial court recognized, this placed plaintiff's counsel directly into administering and implementing the statistical sampling method. This letter and questionnaire, therefore, may have also resulted in "selection bias" in the sample of 22 (i.e., a nonrandom criterion or a selective inclusion or exclusion in choosing the sample). (*Duran*, at p. 43.) Contrast this process with a "double blind" survey in which the questioner and the respondent do not know the survey's sponsor or the survey's purpose.

Third, as the trial court observed, the essential element of the statistical sampling method here—the use of live testimony to prove or disprove satisfaction of "the proviso"—was not developed or created by Dr. Lorden (but rather by plaintiff's counsel), and was not based on any prior studies or research in the relevant fields of statistics or surveys. Furthermore, plaintiff had only 16 of the 22 homeowners testify at trial (plaintiff had deposed all 22, and Monier presented at trial the testimony of the other six).

Fourth, and finally, Dr. Lorden significantly criticized the homeowner survey method that Monier undertook in 2005, when class certification was at issue, but nevertheless relied on this survey to obtain 16 of the 29 clusters of relevant residential development used in drawing the sample of 22.

For these reasons, taken together, we conclude the trial court did not abuse its discretion in excluding Dr. Lorden's expert testimony.

## II. The Trial Court Erroneously Granted Monier's Motions for Nonsuit (CLRA action) and for Judgment (UCL action)

In granting these two motions, the trial court ruled: "[P]laintiff's case rests upon the methodology and expert opinion of Dr. Lorden. . . . [H]is opinions [have been] excluded. Therefore, there is no legally relevant evidence before the fact-finder as to the size of the class, the liability of [Monier] or the amount of damages. [Monier's] motion for nonsuit as to the CLRA cause of action is granted. [Monier's] motion for judgment

10

on the UCL cause of action is granted." Based on this ruling, the trial court granted judgment to Monier.

We conclude the trial court erred. Basically, the trial court confused the *extent* of class liability (Dr. Lorden's statistical sampling method and expert opinion) with the *fact* of class liability and damages (established through other evidence at trial, not challenged on a cross-appeal here).

Monier's motion for judgment on the UCL action was subsumed within its motion for nonsuit on the CLRA action. Thus, the review of the nonsuit motion is the pivotal review.

"In reviewing a grant of nonsuit, we '[evaluate] the evidence in the light most favorable to the plaintiff.' [Citation.] We will not sustain the judgment ' "unless interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of law." ' " (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291.)

Dr. Lorden's excluded statistical sampling method was designed to measure the number of individuals—out of the trial court-accepted and jury-determined figure of 127,746 relevant California homes—who met the class-membership "proviso" we set forth in *McAdams II* (i.e., prior to purchasing or obtaining their Monier roof tile product, they were exposed to a statement of 50-year life, permanent color, or maintenance-free), and thus were members of the CLRA and the UCL classes.[6] Dr. Lorden's excluded testimony, then, concerned the *extent* of the class—i.e., the *size* of the class.

---

[6] And, again, the 127,746 figure was established by plaintiff's accounting expert, Clifford Kupperberg, and is not challenged in a cross-appeal.

11

Other evidence at this lengthy trial established the fact of class *liability* and class *damages*.

To establish the fact of class liability, plaintiff presented (1) the testimony of 20 relevant homeowners, (2) nine additional witnesses regarding Monier's relevant marketing practices, and (3) Monier's relevant marketing literature. Monier countered with a litany of relevant witnesses of its own. As *Duran* recognized, "[c]ertainly class counsel are entitled to select named plaintiffs [and, we add, unnamed plaintiffs] [to testify] in a manner that enhances their position"—here, plaintiff's position on class liability. (*Duran*, *supra*, 59 Cal.4th at p. 43.)[7]

To establish the fact of class damages, plaintiff presented testimony from a damages expert, Phillip Waier, who opined that the average cost to recoat a Monier tile roof was $3,705. (See *Bell*, *supra*, 115 Cal.App.4th at p. 751 [in a class action, if appropriate, a trial court has the discretion to weigh the calculation of average damages that are imperfectly tailored to the facts of particular class members with the opportunity such a calculation affords to vindicate an important statutory policy without unduly burdening the courts].) Again, the jury and the trial court found this figure acceptable, and it is not challenged in a cross-appeal.

Pursuant to special interrogatories in its verdict form, the jury found that plaintiff relied on a material misrepresentation from Monier (failure to disclose premature color erosion) to plaintiff's damage.

---

[7] But, as *Duran* cautioned in its very next sentence, "that tactical choice should not compromise the statistical approach required for random sampling." (*Duran*, *supra*, 59 Cal.4th at p. 43.) These two observations from *Duran* allow us to reconcile (1) the improper use of Dr. Lorden's sample of 22 as insufficiently representative to measure how many homeowners satisfied "the proviso" of *McAdams II*, with (2) the proper use of the same sample from which to draw witnesses on plaintiff's behalf to establish Monier's liability.

12

Consequently, the trial here determined the fact of class liability and the fact of class damages. What the trial has not yet determined—in light of the proper exclusion of Dr. Lorden's statistical sampling testimony—is the number of individuals in the class. The remand will determine that (and each class member will have to show his or her eligibility for recovery—i.e., he or she has or had a Monier slurry-coated color concrete tile roof at issue with premature color erosion).[8]

---

[8] In *McAdams II*, we stated regarding the issue of individual damages (in considering whether a class could be *certified* here): " 'A class action can be maintained even if each class member must at some point individually show his or her eligibility for recovery or the amount of his or her damages, so long as each class member would not be required to litigate substantial and numerous factually unique questions to determine his or her individual right to recover.' [Citation.] Here, the claims of all class members ' "stem from the same source" '—Monier's failure to disclose that the color composition of its roof tiles may erode to bare concrete prematurely. [Citation.] To obtain damages, each class member [(1)] will have to show the representation made to him or her that accompanied this failure to disclose (e.g., 50–year/lifetime, permanent color, maintenance-free, or the like) and [(2)] will have to show the amount of his or her damages. But these two showings do not invoke 'substantial and numerous factually unique questions to determine [the] individual right to recover' damages, and therefore are not a proper basis on which to deny class certification." (*McAdams II*, *supra*, 182 Cal.App.4th at pp. 186-187.)

Now that the class *trial* has taken place, we want to clarify the procedure on remand in light of these two required showings specified in *McAdams II*.

First, as we have made clear in this opinion, a representative statistical sampling method (or an equivalent method) can be used to show the number of individuals who satisfy the *McAdams II* proviso—i.e., who, prior to purchasing or obtaining their Monier roof tile product, were exposed to a statement of 50-year life, permanent color, maintenance-free, or the like. Such a showing will meet the first requirement of *McAdams II* that each class member must show the representation made to him or her that accompanied the failure to disclose.

Second, determining damages in terms of an aggregate classwide damages figure was proper here (e.g., at trial, the jury found there were 2,000 class members, and multiplied this figure by $3,705—the average cost to recoat a Monier slurry-coated tile roof—to arrive at an aggregate classwide damages figure of $7.41 million). As the *Bell* court noted, "[I]t [is] within the discretion of the trial court to weigh the disadvantage of statistical inference—the calculation of average damages imperfectly tailored to the facts

13

In the end, the simplest way to look at this is if the trial court were correct in deeming Dr. Lorden's excluded testimony as the only legally relevant evidence on class size, liability, and damages, there would have been no need for the parade of witnesses and evidence, and the weeks of trial, regarding the facts of class liability and class damages. For plaintiff's case, Dr. Lorden alone would have sufficed.

We conclude the trial court erroneously granted Monier's motions for nonsuit (the CLRA action) and for judgment (the UCL action).[9]

---

of particular employees [who comprise the class]—with the opportunity it afford[s] to vindicate an important statutory policy without unduly burdening the courts. . . . '[An appellate court's] review of a trial court's plan for proceeding in a complex case is a deferential one that recognizes the fact that the trial judge is in a much better position than an appellate court to formulate an appropriate methodology for a trial.' " (*Bell*, *supra*, 115 Cal.App.4th at p. 751.) And, as *Bell* added, "[T]he proof of aggregate [classwide] damages . . . by [a representative] statistical inference reflect[s] a level of accuracy consistent with due process under the [*Connecticut v.*] *Doehr* [(1991) 501 U.S. 1, 11] [115 L.Ed.2d 1] balancing test [(under that test, the question whether a procedural device used in judicial proceedings to deprive a defendant of property comports with due process is determined by a balancing of private and governmental interests with the risk of erroneous deprivation)]. This conclusion is supported by persuasive authority." (*Bell*, *supra*, at p. 755.)

So, using a calculation of aggregate classwide damages is proper here—if that calculation uses a class size number (as a multiplicand) that has been determined from a representative statistical sampling method (or an equivalent method). And such a calculation will meet the second requirement of *McAdams II* that each class member must show the amount of his or her damages, so long as each class member has shown his or her eligibility for recovery (i.e., he or she has or had a Monier slurry-coated color concrete tile roof at issue with premature color erosion). (See *McAdams II*, *supra*, 182 Cal.App.4th at p. 186 [" 'A class action can be maintained even if each class member must at some point individually show his or eligibility for recovery *or* the amount of his or her damages . . .' " (italics added)].)

[9] In its respondent's brief, Monier presents an undeveloped argument that the judgment can be affirmed on the independent ground that plaintiff failed to prove delayed discovery for statute of limitation purposes as to absent class members. In a special interrogatory in its verdict form, the jury found, on the issue of statute of limitations, that Monier did not prove that plaintiff's claimed harm occurred before November 14, 2000.

14

The judgment and the award of costs to Monier are reversed. The trial court is directed to enter judgment of class liability and damages for plaintiff on the CLRA action, based on the jury's findings of class liability and class damages ($3,705 per home (see *Bell*, *supra*, 115 Cal.App.4th at pp. 746-756)). The matter is remanded to the trial court to determine class size and individual eligibility for recovery (such eligibility has been specified herein), through any methods that are appropriate, including representative statistical sampling or witness testimony or survey, or a claims process, individualized mini-hearings, or some other appropriate technique. (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1054 (conc. opn. of Werdegar, J.); see *Duran*, *supra*, 59 Cal.4th at pp. 33, 40, fn. 34 (maj. opn.) [applying that footnote's observation here, we remind the parties that now that the fact of class liability and the fact of class damages have been established, both sides may benefit from a fair, cost-effective approach to determining class membership]; see also *id.* at p. 55 (conc. opn. of Liu, J.).) Since the UCL action is subsumed within the CLRA action and since the trial court excluded only Dr. Lorden's testimony, the trial court is directed to enter judgment of class liability and damages for plaintiff on the UCL action, and to impose, on remand, an

---

Plaintiff filed his original complaint in November 2003. The shortest statute of limitations that applies here, the CLRA, is three years. (Civ. Code, § 1783; see *id*., § 1770.) Against this backdrop, we consider the question of statute of limitations settled against Monier.

appropriate remedy for the UCL claim, if necessary.  Monier's abandoned cross-appeal is dismissed.  Plaintiff is awarded his costs on appeal.  (Cal. Rules of Court, rule 8.278 (a)(1), (2).)


                                                             BUTZ_____, J.


We concur:


_____BLEASE_____, Acting P. J.


_____HOCH_____, J.